# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### BRYSON CITY DIVISION
#### 2:05cv1

| | | |
|---|---|---|
| ANITA DUNCAN, NAOMI DUNCAN, and MARY McCOMBS, on behalf of themselves and similarly situated employees, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | MEMORANDUM OF DECISION and ORDER |
| Vs. | ) ) | |
| PHOENIX SUPPORTED LIVING, INC.; and TONY SCHMIDT, | ) ) ) | |
| Defendants. | ) ) ) | |

**THIS MATTER** is before the court on plaintiffs' Motion for Partial Summary Judgment as to Defendants' Liability on Plaintiffs' Wage and Hour Claims (#104) and defendants' Motion for Partial Summary Judgment (#105). A response and a reply have been filed as to plaintiffs' motion, while only a response has been filed to defendants' motion. Having considered such motion and reviewed the pleadings, the court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSION

### I.    Background

This action concerns a number of grievances plaintiffs have against their former employer which span from allegations of racial discrimination under both 42, United States Code, Section 1981 and Title VII, to federal wage and hour violations under Title 29 of the United States Code. The evidentiary materials submitted by the

parties covers daily disputes between coworkers, the subjective comfort of mattresses, DSS investigations of allegations made by psychotic clients, investigations made by the United States Department of Labor, oral agreements between employees and employers, and alleged discrepancies in paychecks versus time sheets. .

## II.    Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial.  Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*."  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts.  Anderson, supra.  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."  Id. at 248.  A dispute about a material fact is "genuine" only if the

evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

In this case, cross-motions for summary judgment have been filed. Where cross motions for summary judgment are filed, such motions are

> no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.
> In short, the mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury.

Wright & Miller, 10A Fed. Prac. & Proc. Civ.3d § 2720.

**III. Defendants' Motion for Summary Judgment as to Anita Duncan's Title VII Claims**

Despite providing the court with over three and a half pages of legal argument as to why Ms. Duncan's Title VII claims are barred for failure to file her claim of discrimination within 90 days of receipt of the right to sue letter, as required by 42, United States Code, Section 2000e-5(f)(1), and having actually conceded that the 90th day was Friday December 31, 2004, defendants failed to advise the court that such last day of filing was in fact a federal holiday. Thus, Ms. Duncan's last day for filing was Monday, January 3, 2005, a day on which she actually delivered her Complaint to the Clerk's office for filing along with an application to proceed *in forma pauperis,* which was promptly granted by this court the following day.

Thus, the only issue is whether receipt of the Complaint by the Clerk of this Court on the last day for filing satisfies Section 2000e-5(f)(1). Review of case law, which originates from this district, provides a direct answer: yes. In Robinson v. Yellow Freight System, 1989 WL 152510 (4th Cir. 1989),[1] defendant moved to dismiss a Title VII complaint because the Complaint was not filed within the 90-day limitations period. In that case, like this one, the plaintiff's *in forma pauperis* application was not immediately granted, and the date the Complaint was stamped

---

[1]      Due to the limits of ECF, copies of all conventionally unpublished decisions cited herein are placed in the court docket by reference to the Westlaw citation. In accord with Rule 32.1, U.S. Ct. of App. 4th Cir., the court finds such opinion to have precedential value in relation to a material issue in this case and that there is no published decision that could serve so well to address the issue placed before the court by the parties.

"filed" was outside the 90-day limitations period. The <u>Robinson</u> court held, as follows:

> Under Fed. R. Civ. P. 3, "a civil action is commenced by filing a complaint with the court." However, under 28 U.S.C. Sect. 1915(a), the district court may not authorize the commencement of a suit without the payment of fees or until the petitioner files an IFP application. This case presents a situation involving the interplay of these two requirements. That is, does the fact that Robinson's complaint was received by the court before the limitations period had expired make it timely filed despite his failure to file timely an IFP application?
>
> We think that in this context "[f]iling a complaint requires nothing more than delivery to a court officer authorized to receive it." Therefore, Robinson's complaint was filed on June 16 and prior to the expiration of the limitations period. We are supported in this view by the undisputed fact that the basis for Robinson's claim was in possession of the court within the limitations period. . . . we hold that Robinson's Title VII complaint was filed when he delivered his complaint to the clerk.

1989 WL, at 1-2 (citations omitted). Based on <u>Robinson</u>, Ms. Duncan's delivery of her Complaint and IFP application on January 3, 2005, to the Clerk of this Court was the equivalent of filing under Rule 3 for purposes of Title VII review. <u>Id.</u> <u>See also</u> <u>Davidson v. Memorial Mission Hosp., Inc.</u>, 2001 WL 1019786 (W.D.N.C. 2001). Defendants' Motion for Summary Judgment on such basis will be denied.

**IV. Defendants' Motion for Summary Judgment as to Ms. Anita Duncan's First Cause of Action "Title VII Hostile Work Environment" and Second Cause of Action "Section 1981 Hostile Work Environment."**

Ms. Anita Duncan asserts that she was subjected to a hostile work environment under both 42, United States Code, Section 1981, and under Title VII of the CivilRights Action of 1964. Defendants contend that such plaintiff cannot present evidence of a *prima facie* case and that they are entitled to summary judgment on

such claims. Inasmuch as the elements of proof are identical, <u>Gairola v. Virginia Dept. of Gen. Serv.</u>, 753 F.2d 1281, 1285-86 (4th Cir. 1985), these claims will be discussed together.

As her basis for these claims, Ms. Anita Duncan, who is African-American, alleges that coworkers and a supervisor used racially offensive language and abbreviations of offensive language, that another co-worker engaged in offensive acts or displays utilizing decorative ceramic dogs, and that other coworkers wore apparel that displayed the confederate flag, and that such actions combined to create a hostile work environment.

On a claim of a hostile work environment, plaintiff must present evidence upon which a reasonable finder of fact could return a verdict in her favor on each of the following elements:

(1)     she was harassed because of her race;

(2)     the harassment was unwelcome;

(3)     the harassment was sufficiently severe or pervasive to create a hostile work environment; and

(4)     some basis exists for imputing liability to the employer.

<u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179 (4th Cir 2001).

For the limited purpose of this motion, the court will presume without deciding that plaintiff has satisfied the first two elements as to her hostile work environment claim.

To satisfy the third element of a hostile work environment claim, plaintiff must

come forward with evidence tending to show that she was subject to harassment that was sufficiently severe or pervasive so as to create a hostile work environment. Plaintiff has presented evidence that she heard a former co-worker using the term "little nigger" or the abbreviation "l.n." to refer to other African-Americans, but that such term was never directed toward her. Plaintiff has also testified that she overheard or participated in conversations with co-workers concerning their views on inter-racial dating. Review of Ms. Anita Duncan's testimony reveals that she did not believe that such comments concerning dating were intended to make her work unpleasant or intolerable. The co-worker who used the term "little nigger" also apparently discussed the "Klan"during working hours, but only after Ms. Anita Duncan brought the topic up by referring to Hayesville as a base for the Klan, to which the coworker advised that a section of the town was known as "Klan town."

In addition, plaintiff presented testimony concerning this same coworker's inappropriate use of small ceramic dogs that had been intended decorations in one of the group homes. Apparently, this co-worker used the pull cord on window blinds to tie a noose around one of the dog's necks, which Ms. Anita Duncan took to be a reference to a supposedly racist part of the community the "Hanging Dog" section of Hayesville.[2] Ms. Anita Duncan's testimony reveals that when she reported such

---

[2]    The court takes judicial notice of the actual origin of "Hanging Dog" in the Cherokee County area of North Carolina, which has been used in the official naming of a number of features. According to William S. Powell, The North Carolina Gazetteer (UNC Press 1984, Chapel Hill), Hanging Dog Creek was so named "because an Indian's hunting dog became hung in a mass of jammed logs and vines in the flooded creek." Id., at 212.

incident to defendants, they not only removed the offensive display and placed the dog in a china cabinet, they disciplined the offending co-worker. As to the wearing of clothing with the Confederate flag, she testified that such coworkers were not wearing the clothing to offend her or to make her workplace intolerable, but only to express their own opinions. As to the wearing of such clothing by the coworker who had made racial remarks and created the inappropriate display with the hanging dog, Ms. Anita Duncan believes that such employee started wearing such clothing because such employee believed that Ms. Anita Duncan was angling for her job, not because she was black. Review of the entirety of the evidentiary record indicates that the interpersonal dispute between Ms. Anita Duncan and this coworker was centered not on race, but on such coworker' fear that Ms. Anita Duncan wanted her job. The court will go no further in detailing the day-to-day allegations of Ms. Anita Duncan; such allegations and the relevant testimony are well covered and accurately summarized in defendants' Brief in Support of their Motion for Summary Judgment, which are adopted by reference.

"Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir.), cert. denied, 117 S. Ct. 70 (1996). Rather, its purpose is to protect a "reasonable person" from an environment in which abuse is sufficiently severe or pervasive as to alter the conditions of his or her employment. Id., at 753 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 19 (1993), and Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).

In the context of summary judgment, the issue is whether evidence of use of racially derogatory language in referring to persons of a plaintiff's race or ethnicity is sufficient as a matter of law to warrant trial. In <u>Hartsell v. Duplex Products, Inc.</u>, 123 F.3d 766 (4th Cir. 1997), the appellate court held that Title VII "prohibits only harassing behavior that is so severe and pervasive as to render the workplace objectively hostile." <u>Id.</u>, at 773. In <u>Harris v. Forklift Systems, Inc.</u>, <u>supra</u>, the Supreme Court held that isolated comments are simply not enough to give rise to a Title VII claim of unlawful harassment. Severe conduct is conduct that would be extreme, amounting to a change in the terms and conditions of employment. <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75 (1998).

First, the use of the term "nigger" is never acceptable and is a term that any reasonable, civil person would find objectionable and offensive irregardless of whether the term is used as a personal insult, to refer to others, or even to refer to oneself. Indeed, use of such is patently offensive to not only African-Americans, but offensive to members of other racial or ethnic groups, including Caucasians. As the Court of Appeals for the Fourth Circuit has found:

> Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African-Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.

<u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 185 (4th Cir. 2001)(citations and corresponding quotation marks omitted). The plaintiff in <u>Spriggs</u> was, however, exposed personally to racist comments on a "'continuous daily' basis . . . ." <u>Id.</u>, at

184.   In this case, Ms.  Anita Duncan was never the target of any racist or discriminatory comments.  As to the "hanging dog," the evidence is clear that when Ms. Anita Duncan complained to management of conduct she found to be offensive, defendants took prompt remedial action and disciplined the offending employee.  As to the wearing of clothing with the Confederate flag displayed thereon, even Ms. Anita Duncan testified that she did not believe such clothing was being worn to make her workplace intolerable, but instead it was an expression of personal opinion by the employee who was wearing such item.

Considering each alleged incident, however, none  is "severe" in that it could not be reasonably viewed as changing the terms and conditions of plaintiff's employment.  Title VII does not mandate an insult-free workplace and federal courts are not arbiters of speech, even the most offensive speech, in the workplace.  Ms. Anita Duncan cannot point to any change in the conditions of her employment based on these incidents.   The court has considered the alleged incidents within the totality of the circumstances presented in this case.  Harris v. Forklift Sys., Inc., supra.  Those circumstances include the undisputed facts that Ms.  Anita Duncan was recently hired by the very same people she accuses of creating a hostile work environment; that when she pointed out conduct she found offensive, these employers took her side and took prompt remedial action; and, most importantly, plaintiff does not point to any mistreatment by management, rather, she at most can only infer such from the inappropriate workplace behavior of former coworkers.  Thus, the totality of the circumstances point not to an employer who was trying to make work so inhospitable

as to cause Ms. Anita Duncan to quit; rather, the circumstances show that her employer at every turn attempted to keep her happy in her work.

In determining whether there was a hostile or abusive work environment, the court looks to the totality of the circumstances. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998). In making such a determination, the Supreme Court requires courts to consider

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

<u>Harris v. Forklift Sys., Inc.</u>, <u>supra</u>, at 23. Indeed, plaintiff's own testimony is that she was never personally subjected to racially derogatory remarks and there simply is no testimony that her work suffered or that she was any less effective in performing what appear to be very responsible duties in caring for persons with emotional challenges. Applying all of these factors, as discussed at greater length above, it is readily apparent that plaintiff was never personally the object of racial slurs, and that racial bias, if any, in no way interfered with the quality of her work, the environment of the workplace, or the circumstances of her employment. The appellate court in <u>Hartsell</u> pointed out that the misconduct must render the workplace *objectively* hostile, not subjectively. The court has searched plaintiff's evidence and, while finding that while plaintiff may have subjectively believed she was treated differently due to race (even though her own testimony infers that she did not even have a subjective belief), the undersigned can find no objective evidence - - either circumstantial or direct - -

that the alleged racist comments or other conduct of coworkers manifested themselves in adverse conditions of plaintiff's employment. Indeed, it would appear that Ms. Anita Duncan was doing such good work that other employees feared she was "angling" for their jobs. While the alleged racial slurs reported, taken as true, would reflect an archaic, insensitive, and crude attitude, there is no evidence that they affected any term or condition of plaintiff's employment. It appears that such comments had no objective impact on plaintiff's day-to-day employment. Plaintiff has not satisfied her burden of coming forward with evidence upon which a reasonable finder of fact could determine that her workplace was charged with race-based discrimination so as to make it objectively abusive. See Smith v. First Union Natl. Bank, 202 F.3d 234 (4th Cir. 2000).

Title VII simply does not guarantee a workplace free from racial slurs and insensitive coworkers. Plaintiff's Title VII and Section 1981 hostile-work-environment claims will be dismissed for failure to satisfy the third element.

Further, no evidence has been presented that the defendants were ever informed of alleged offensive conduct by plaintiff, other than the hanging dog, as to which they took prompt remedial action. A corporate employer may be held liable for a hostile environment claim when it had actual or constructive knowledge of the existence of the hostile work environment and took no prompt remedial action. Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir.1989). "[A]bsence of notice does not necessarily insulate that employer from liability." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 72 (1986). There is no strict liability of corporate defendants in the hostile work

environment arena; however, actual knowledge by a corporation is not required and a company may be found liable where it had "constructive knowledge." A working definition of "constructive knowledge" is found in <u>Ohio Farmers Indem. Co. v. Charleston Laundry Co.</u>, 183 F.2d 682 (4th Cir. 1950):

> The general rule of law respecting notice to or by an officer or agent of a corporation is that the rights of the corporation are not affected unless the notice is in regard to a matter coming within the sphere of the agent's duty while attending to the business of the corporation . . . .

<u>Id.</u>, at 604. There is no evidence that anyone confronted or reported any use of racial slurs to defendants. Thus, Ms. Anita Duncan's claims also fail as to the fourth element of a hostile work environment claim.

## V. Defendants' Motion for Summary Judgment as to Ms. Naomi Duncan's Second Cause of Action "Section 1981 Hostile Work Environment."

Ms. Naomi Duncan's claim is that a change occurred in the way in which other coworkers regarded her. She believes that defendants created a "hostile work environment" because defendants' manager, Ms. Nemkovich, was not friendly to her, although Naomi admits that she did not consider the atmosphere racially hostile during the entire eleven months of her employment. N. Duncan Dep. Vol. I, pp. 61-63, 64. It was only in September, 2003, more than six months into her employment, that she felt the atmosphere was hostile because it was not "friendly towards her anymore," because she felt "uncomfortable" and because she felt that Ms. Nemkovich was "freezing her out" and the coworker, who had made the offense racial remarks and engaged in the inappropriate workplace conduct discussed above, talked to her less. <u>Id.</u>, at 71, 73.

As evidence of a hostile work environment, Naomi Duncan alleges that she heard Ms. Nemkovich use the abbreviation "l.n." in conversation on three occasions. Id., at 24, 30. The first time, she overheard Ms. Nemkovich use the term "l.n." in a conversation with a coworker in referring to one of the group homes as the "l.n. house." Id., at 24. The second time, she was in a group meeting in August, 2003, and she alleges she heard Ms. Nemkovich say, in reference to the River House, "this will be in the l.n. house." Id., at 22. At that time, Naomi did not know what Ms. Nemkovich meant by that term, and no one responded to Ms. Nemkovich's comment. Id., at 22-23. The third time, she heard Ms. Nemkovich tell a coworker that "there has been some discussion about 'l.n.'" Id., at 23. In response, Naomi claims that the coworker said "We need to talk about it." Id., at 24. Ms. Naomi Duncan also claims that the coworker used the term "l.n." on one occasion in a conversation with another coworker. Id., at 26. She further testified that this second coworker used the term on one occasion also when talking to the first coworker, allegedly saying "there is a problem with the l.n.," but Naomi did not hear the co-worker's response except that she did heard her say "Let's talk." Id., at 34.

Ms. Naomi Duncan's testimony regarding other use of racial epithets is limited to two allegations. She claims that, on just one occasion, she heard the first coworker when she was discussing a movie in her presence and that of a client, describe the actor Arnold Schwarzenegger as Arnold "Schwarznigger." Id., at 40-41, 62. The client corrected the coworker. Id. She alleged that the term "nigger" is limited to a single comment by the second coworker, id., at 42-45, who allegedly used the term

while describing the murder of an acquaintance by a "black person" and the subsequent criminal trial. Ms. Naomi Duncan testified that she confronted this coworker and told her that she was uncomfortable with the use of the word, and the coworker responded that, "I don't mean anything derogatory towards you. It's just an expression that we use." Id. Ms. Naomi Duncan did not allege that she reported this incident to management. The "hanging dog" incident appears to be of little significance to this plaintiff's claim. As to the interracial dating comments discussed above, Ms. Naomi Duncan testified that the coworker who made the comments did not do so "in a hostile way," but that she believed it was "unfriendly" because Martin "shifted her eyes" when she said it. Id., at 54. As to clothing displaying the Confederate flag, Ms. Naomi Duncan never asked her coworkers about the clothing and the coworkers never made comments about the Confederacy, black people, or anything that she found racially offensive. Id., at 62-65. Finally, Ms. Naomi Duncan never complained to management about such clothing. She also denies ever hearing anyone refer to the Ku Klux Klan. Id., at 71. She also admitted that the claim in her Amended Complaint that "Plaintiffs repeatedly expressed abhorrence and opposition" to alleged racist acts does not refer to her. Id., at 73. She never complained to management about any racist behavior and she testified that management never discouraged her from bringing a complaint. Id., at 72-74. Despite such testimony, she did, however, believe she could receive a "harder schedule" if she complained, id., at 74, 77, and that she did not complain because, historically, "they hang black people" and in the work place "they can hang you in various ways." Id., at 78.

Ms. Naomi Duncan's beliefs and speculation are simply not evidence relevant to this court's inquiry, and Ms. Naomi Duncan's proof suffers from the same deficiencies as does Ms. Anita Duncan's. Speculation and conjecture raise a mere possibility of discrimination rather than the reasonable probability which is necessary to support an inference of discrimination. Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-42 (4th Cir. 1982). Speculative assertions that a defendant's or a person's motivation was unlawful is not enough to withstand summary judgment, Goldberg v. B. Green and Co., 836 F.2d 845, 848 (4th Cir. 1988), and conclusory statements will not satisfy plaintiff's burden in responding to the motion for summary judgment. Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211 (4th Cir. 1987). Unsupported allegations "do not confer talismanic immunity from Rule 56." Ross v. Communications Satellite Corp., 759 F.2d 355, at 365 (4th Cir. 1985). Plaintiff's allegations of discriminatory animus in her supervision are clearly speculative. A court cannot allow a jury to decide issues based on speculation. Fed.R.Evid. 401 & 602. Finding that plaintiff cannot meet the third or fourth elements, the court will grant defendants' Motion for Summary Judgment as to this plaintiff's second claim.

## VI. Defendants' Motion for Summary Judgment as to Ms. Anita Duncan's Title VII Disparate Treatment Cause of Action.

To survive summary judgment on this claim, plaintiff must present evidence that a facially neutral employment practice or policy falls more harshly on one group of individuals than another and cannot be justified by business necessity. Chapman

v. Lorillard Tobacco Co., 342 F.Supp. 2d 383, 395 (M.D.N.C. 2004). To establish a *prima facie* case of disparate treatment, Anita Duncan must show: (1) that she is a member of a protected class; (2) that she can demonstrate satisfactory job performance; (3) that she was subjected to adverse employment action; and (4) that similarly situated employees outside her class received more favorable treatment. See Texas Dep't of Cm'ty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Ms. Anita Duncan claims that defendants assigned less desirable shift to African-Americans, tried to impose a driving requirement on her even though they knew plaintiff did not have a driver's license, that she was reported to DSS when a patient accused her of threatening her with a knife while a white employee was not reported to DSS, that she did not receive a $50 Christmas bonus because of a disciplinary write up, but that a white employee received a Christmas bonus who had been written up, and that African-American employees receive less pay than white employees for the same work.

Plaintiff admitted at her deposition that a white employee was also given the undesirable shifts, A. Duncan, at 350, but had no other evidence to support such claim. Id.

As to the driver's license issue, Ms. Anita Duncan admitted that management simply forgot that she did not have a license, but that when the company required all employees to have a drivers license by a certain date, it "was harassment to me because she knew I didn't have a license and couldn't get one." A. Duncan, at 268. She fails to, however, to show any nexus between the requirement of a driver's

license and her race, and it is patently clear that a legitimate business concern exists inasmuch as taking client to appointments and picking up medications appears to be part and parcel of the work in group homes.

As to the DSS issue, Ms. Anita Duncan admitted that defendants were required to report the client's allegation to DSS, that defendants investigated the claim, and determined that the claim had no merit. She further admitted that the failure to report the white coworker for a similar claim by the same patient, that came after the claim made against her, could well be justified due to the lack of credibility such client had after making a false allegation against her. A. Duncan, at 280-293, 424-428.

As to the alleged disparate treatment as to Christmas bonuses, the record is clear that the white coworker also did not receive a Christmas bonus; thus, defendants treated white and black employees alike.

As to the alleged disparate treatment as to difference in pay, Ms. Anita Duncan testified that at least one of the other coworkers who was paid more - - .75 cents per hour more - - had more experience. There is no evidence as to the qualifications of the other employee, and plaintiff appears to be speculating that she was equally qualified, had the same experience, and had the same duties as this remaining higher paid white employee.

It is plaintiff's burden on summary judgment to come forward with evidence upon which a jury could find in her favor as to each element of her claim. Plaintiff's conclusory and bare bones allegations as to a white employee being paid .75 cents per hour more, without more, are simply not sufficient to allow her to present this claim to a jury. Summary judgment will be granted as to this claim.

**VII. Defendants' Motion for Summary Judgment as to All Plaintiffs' Section 1981 Disparate Treatment Claims**

The court will dismiss Ms. Anita Duncan's Section 1981 disparate treatment claims for the same reasons as her Title VII disparate treatment claims fail.

Similarly, Ms. Naomi Duncan's Section 1981 disparate treatment claims fail because she admits she had no direct or circumstantial evidence to support such claims, A. Duncan, at 83-84, 102-103, and the only evidence she has is her own speculation and conclusions. Id., at 83-86. While Ms. Naomi Duncan attributes a number of employment decisions to her race, she can point to absolutely no evidence that back up such suspicion. As discussed throughout this decision, speculation and conclusions are not sufficient proof of a claim and this claim will be dismissed.

Ms. Mary McCombs, who is African-American, also claims under Section 1981 that she was subjected to unlawful disparate treatment because of her race. Ms. McCombs believes that she was not assigned to work at the group home of her choice because defendants wanted her to work at the group home where all black employees were sent to work. McCombs, at 20. She further believes that white employees were held to a less stringent work standard than black employees. She admits that she has no evidence to support such belief. Id., at 39. The one incident that she points to where another employee was held to a lesser standard is not relevant to her claim inasmuch as such employee is also African-American. She also contends that white employees were given better shifts and more weekends off that African-American employees, but she admitted that she had no evidence to back up such claim. Id., at 65-66. Her allegation of disparate pay also has no support inasmuch as she admitted that she had no evidence that would support such a claim and that such employee had

more experience than she had.  Id., at 78-80.  Because Ms.  McCombs admits that her claims are based on no more than her own speculation and conclusions as to a discriminatory animus, the court must dismiss Ms.  McCombs' Section 1981 claim for disparate treatment.  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985), citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984).

## VIII. Defendants' Motion for Summary Judgment as to Ms.  Anita Duncan's Fifth Cause of Action for Title VII Retaliation.

Ms.  Anita Duncan's fifth cause of action is for retaliation under Title VII. Such a claim is not, however, dependent on the validity of the underlying claim, inasmuch as it is unlawful for an employer to retaliate against an employee for filing a charge of discrimination even where the employee asserts what is later determined to be a baseless claim of discrimination.  Thus, the undersigned has treated this claim separately from the other causes of action.

A plaintiff may establish a case of retaliation for making charges of racial discrimination through use of a "McDonnell-Douglas scheme." McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991).  To make out a *prima facie* case of retaliation, plaintiff would have to show the following:

    (1)    she engaged in protected activity;

    (2)    she was subjected to an adverse employment action; and

    (3)    a causal relationship existed between the first two elements.

Id.  If a plaintiff establishes such a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment

action. <u>Texas Dept. of Community Affairs v. Burdine</u>, <u>supra</u>. Upon such a showing by the employer, the burden would then shift back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not true reasons, but were pretext for retaliation. <u>Id</u>. To make such a showing, the plaintiff must prove that "but for" the protected conduct, the adverse employment action would not have occurred.

She first complained to Ms. Nemkovich in September 2003, and complained to defendant Tony Schmidt and Ms. Nemkovich about racial harassment and disparate treatment in November 2003. A. Duncan, at 442-444. In her Amended Complaint, Ms. Anita Duncan cites six distinct kinds of retaliation after she "complained of what she perceived to be racial harassment and disparate treatment," Amended Complaint, at ¶ 5, as follows:

(1)     "no employees were disciplined, no training was given, and nothing of any substantive nature addressing Plaintiffs' concerns was otherwise done," Amended Complaint, at ¶ 5(a);

(2)     that she was told that she would be terminated if she confronted other workers about racists remarks, <u>id.</u>, at ¶ 5(b);

(3)     that she and other workers who complained were assigned to work with patients known by defendants to be violent, <u>id.</u>, at ¶ 5(c);

(4)     that she was placed in a "hazardous situation," to wit, the care of another client, despite the lack of safety training, <u>id.</u>, at ¶ 5(d);

(5)     required her to get a driver's license and be able to lift 100 pounds, <u>id.</u>, at ¶ 5(e); and

(6)     defendants fabricated a false report of patient abuse against her and submitted such report to a licensing board, id., at ¶ 5(f).

These contention will be addressed briefly *seriatim*.

Failure to Discipline Other Employees.  Allegations that defendants refrained from discipline of other employees, failed to provide unspecified "training" to other employees and failed to do anything of an unspecified but "substantive nature addressing Plaintiffs' concerns", standing alone, does amount to the taking of "adverse employment action" against Ms. Anita Duncan.  Plaintiff simply cannot use an employer's failure to fully credit her contentions and take action that she believes would have been appropriate as retaliation against her.  Indeed, plaintiff is attempting to reargue her disparate treatment allegations in support of her retaliation claim.  As mentioned from the outset in discussing this type of claim, the court has treated it separate and apart from the merits of her other contentions inasmuch as retaliation can occur even where there is no underlying discrimination.  A claim for "retaliation" must be shown by evidence that the employer somehow took adverse action against the employee when such employee attempted to assert, protect, or assert on behalf of others federally protected rights.  This contention simply provides no basis in theory or fact.

Threatened Termination if She Confronted Coworkers Who Used Racial Slurs.  Ms. Anita Duncan contends that she was told by Ms. Nemkovich "that she would be terminated" in a written memorandum dated October 1, 2003, A. Duncan, at 447-448.  Such document included

some terminology … that said that it [inappropriate remarks] would be handled by management, and it also alluded to the fact that you were also not supposed to confront the issue yourself.

A. Duncan, at 447. The memorandum "kind of alluded to you [*sic*] were not supposed to confront the issue yourself", from which Ms. Duncan concluded that she "could be terminated if I said something back." Id., at 447.

Ms. Anita Duncan's recollection varies from the actual memorandum of October 1, 2003, which the court finds to be the best evidence of what such document actually provided. The actual memorandum was sent to all employees, not just plaintiff, and provided as follows:

It has been brought to the attention of administration that there is [sic] racial slurs and comments and hostility among employees. Administration will not tolerate any of this among any of its employee. If it is reported and proven or if administration hears racial slurs or gossip[,] it will be automatic dismissal.

Defendants' Exhibit "I." This claim is facially without merit inasmuch as the memorandum reflect the type of remedial action that should be taken by an employer where a complaint of discrimination or inappropriate conduct is made in the workplace. Ms. Anita Duncan's spin on what the memorandum actually provided is of no relevance, appears to be inadmissible, and will not support a claim for retaliation.

Unfavorable Work Assignments. Ms. Anita Duncan claims that she and another employee, who opposed the supposedly racially hostile environment, were both assigned to work alone with patients known by defendant to be violent. Such assignments were made by Ms. Nemkovich. A. Duncan, at 450. She claims that she

was assigned to work with this patient in retaliation for having made previous complaints. Id., at 454. She contends that defendants "knew that [this client] was hostile" to her and in making such assignment it was defendants' intent to make her "suffer."

Id.,at 456. Plaintiff admits, however, that her conclusion is not supported by any evidence and " must have been retaliatory just because [defendants] knew that [this client] was racist and possibly dangerous." Id., at 460. She further admits, however, that such client's violence was not limited to African-Americans, and that she "was a violent, mentally ill person," and that her violence was not "restricted . . . to African-Americans" and she had "in the past been violent toward numerous Caucasian employees." Id., at 467-468. She further admits that her assignment to work with this patient was not 'retaliatory on any other basis." Id., at 461.

The assignment of additional work or even the assignment of unpleasant work is not enough to make out a claim of retaliation.

> Plaintiff cites only two instances in which he was assigned more work than his co-workers, hardly a "pervasive" problem rising to the level of an adverse employment action.

Gbenoba v. Montgomery County Dept. of Health and Human Services, 2005 WL 1490008, (D.Md. 2005). The fact that an employee was given extra work during assignments did not constitute "adverse employment action," and thus could not serve as basis for retaliation claim under Title VII. Johnson v. Aluminum Co. of America, 2005 WL 2810687 (M.D.N.C. 2005). The court can find no merit to this claim.

Placing Plaintiff in a Hazardous Situation.  In this contention, Ms.  Anita Duncan contends that defendants assigned her another client, for whom she "had not received the appropriate safety training."  Compl. at ¶ 5(d). A. Duncan, at 469-470. Plaintiff testified, however, that she believed she had been placed in a hazardous situation from the beginning of her employment, well before she engaged in protected conduct: "I feel like I was always placed in a hazardous situation throughout my employment." Id., at 470-471.  Thus, plaintiff's testimony is antithetical to her claim inasmuch as she has testified that nothing changed.  Indeed, like the jobs of a fireman, policeman, and power company lineman, one would think that the job of a habilitation technician also comes with the hazards associated with caring for the mentally and emotionally ill, which is a real risk of physical assault.   The court can find no merit to this claim of retaliation inasmuch as plaintiff has failed to show any link between her complaints and the alleged retaliation.

Requiring a Driver's License and Being Able to Lift 100 Pounds.  It is undisputed in this record that such requirements were not limited to Ms.  Anita Duncan, but applied across the board to all habilitation techs.  A. Duncan, at  479. As discussed above, it appears that having a driver's license would have served a real need of this employer to provide transportation for its clients as well as services such as picking up medications.  Even if plaintiff could have made a prima facie case of retaliation based on such requirement, the burden would shift back to plaintiff upon a showing a legitimate business concern, and plaintiff would be required to show that it was mere pretext for discrimination and that the plaintiff's race is the more likely

reason for the action. <u>Herold v. Hajoca Corp.</u>, 864 F.2d 317, 319 (4th Cir. 1988), <u>cert</u> <u>denied</u>, 490 U.S. 1107 (1989).

> The question is not whether [defendant] exercised prudent business judgment, . . . but whether [plaintiff] has come forward to refute the articulated, legitimate reasons for his discharge. In this regard, [plaintiff] must do more than challenge the judgment of his superiors through his own self-interested assertions.

<u>Dale v. Chicago Tribune Co.</u>, 797 F.2d 458, 464 (7th Cir. 1986)(citations omitted), <u>cert</u>. <u>denied</u>, 479 U.S. 1066 (1987). Consistent with the Court of Appeals for the Seventh Circuit, the Fourth Circuit reasoned that what is relevant is not a plaintiff's belief that her employment was adversely impacted because of her race, or for retaliatory purposes, but "the perception of the decision-maker." <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980). <u>See</u> <u>Elliott v. Group Medical & Surgical Service</u>, 714 F.2d 556 (5th Cir. 1983). The evidence in this case runs counter to a claim of pretext inasmuch as it appears that habilitation techs were routinely asked to drive vehicle as part of their job assignments

Finally, plaintiff's claim concerning the 100 pound lifting requirement is irrelevant since it is undisputed that such requirement was not put in place until after she left defendants' employ.

The court finds that these contentions are not supported by evidence of record and would not support a claim of retaliation.

<u>False Report of Patient Abuse</u>. Ms. Anita Duncan further claims that defendants "knowingly fabricated a false report of patient abuse by plaintiff Anita Duncan and submitted said report to a North Carolina licensing board … three

months after Ms. Duncan began complaining of a racially hostile environment and disparate treatment …." Amended Complaint , at ¶ 5(f). She apparently claims that submission of that report was in retaliation for her having engaged in protected activity; however, the only competent evidence of record is that such report was submitted by defendants only because it was directed to do so by the North Carolina Division of Facility Services. Nemkovich Aff., at ¶ 25. While plaintiff has certainly speculated that such report was improperly motivated, such speculation does not constitute competent evidence of retaliatory motive. The court finds that this contention is not supported by evidence of record and would not support a claim of retaliation.[3]

* * *

In addition to reviewing such contentions individually, the court has also considered whether such contentions as a whole could support a claim of retaliation for participating in protected activity.

> The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. As we have explained, the Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation. We agree with the formulation set forth by the Seventh and the District of Columbia Circuits. In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

---

[3] Plaintiff also contends that a letter sent to her by counsel for defendant was retaliatory, however, it appears that such letter was sent out well after she had left defendants' employ.

<u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, ___ U.S. ___, 126 S.Ct. 2405, 2414 -2415 (2006)(citation omitted). The Court went on to hold that

> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

<u>Id.</u>, at 2415. Thus, when all the complained of activities are viewed from the prospective of a reasonable person in plaintiff's position, <u>id.</u>, and the totality of the contentions are considered, this court can not find that there is sufficient evidence of any retaliation so as to warrant trial of this claim by a jury.

**IX.    Defendants' Motion for Summary Judgment as to Ms. Anita Duncan's Sixth Cause of Action for Section 1981 Retaliation.**

The discussion contained in the preceding section is incorporated herein by reference, and find that Ms. Anita Duncan's Sixth Cause of Action is an analogue of her Fifth Cause of Action, the court will dismiss her Sixth Cause of action for the same reasons.

**X.    Defendant Tony Schmidt's Motion for Summary Judgment as an Improper Party to Claims of Discrimination under Either Title VII or Section 1981.**

Defendant Tony Schmidt, who appears to be a shareholder of the corporate defendant, an officer of defendant, and a management employee of such company has moved for summary judgment contending that he is not a proper party to the Title VII and Section 1981 claims inasmuch as he is not an "employer." This court agrees. The reasoning of the Court of Appeals for the Fourth Circuit in <u>Lissau v. Southern Food Service, Inc.</u>,159 F.3d 177 (4th Cir. October 28, 1998), compels this court to dismiss the Title VII claims brought against the individual defendant. Clearly, a

supervisory employee is not an "employer" subject to Title VII  liability under the reasoning of <u>Lissau</u>.  Further, as to the Section 1981 claims, plaintiffs have produced no evidence that such defendant "intentionally cause[d] [the] corporation to infringe the rights secured by" Section 1981. <u>Tillman v. Wheaton-Haven Recreation Ass'n, Inc.</u>, 517 F.2d 1141, 1145 (4th Cir. 1975).

**XI.   Plaintiffs' Motion for Partial Summary Judgment as to Liability on Certain Aspects of their FSLA Claim.**

Plaintiffs seek partial summary judgment, arguing there are no genuine issues of material fact as to whether defendants are liable for unpaid overtime based on (1) hours worked during any workweek in excess of 40 hours where such is shown on time sheets but not compensated on plaintiffs' corresponding paychecks (amounting to a cumulative total of eight hours for all plaintiffs); (2) for all sleep time for any "tour" lasting less than 24 hours; and (3) for sleep time for tours lasting 24 hours or more inasmuch as the parties had no written agreement or a meeting of the minds. For the reasons discussed below, plaintiffs' Motion for Partial Summary Judgment will be denied inasmuch as genuine issues of material fact remain to be resolved by the finder of fact at trial.

### A.   Overtime for Hours Worked Over 40 in Any One Week

Plaintiffs argue that copies of the respective plaintiffs' pay receipts and work schedules on their face support summary judgment against defendants on the issue of liability for all non-sleep overtime hours worked.  For purposes of clarity, the court will simply refer to such alleged overtime as "straight overtime" hereinafter.

To be liable under the FLSA for unpaid overtime wages, plaintiffs must

establish by a preponderance of the evidence that :

(1)     they worked overtime hours without compensation; and

(2)     their employer knew (or should have known) that they had worked overtime but did not compensate them for it.

Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986).

In support of their motion for partial summary judgment on this issue, plaintiffs argue that defendants have failed to adequately produce payroll and scheduling records.  When an employer's records are inadequate or inaccurate, an employee carries his burden under the law by  "proving that he has in fact performed work for which he was improperly compensated," and by "producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Lee v. Vance Exec. Protection, 7 Fed. Appx. 160, 166 (4th Cir. 2001)(citation omitted).

In support of their contention that there is no issue of material fact as to nonpayment, each plaintiff has proffered one pay stub and one schedule, which demonstrate that they worked those hours and did not receive "time and one half" for any hours over forty worked in a workweek.  See Plaintiff's Ex. A (two hours of unpaid overtime for Naomi Duncan); Ex. F (five hours of unpaid overtime for Anita Duncan); and Ex. G (one hour of unpaid overtime for Mary McCombs).  Other evidence submitted in support of such motion includes the testimony of plaintiff that they were not paid overtime on other occasions. McCombs, at 11, N. Duncan, at 82.

It is unclear to this court at this point whether any of the alleged hours in

excess of 40 were straight time or sleep time. Further, it appears that a genuine issue of fact exists as to the accuracy of defendants' payroll records: while plaintiffs have cited discrepancies between the numbers of hours worked versus the number of hours paid, defendants have pointed out that plaintiffs arguments are themselves in error, as follows:

> Plaintiffs' recitation at footnote 5 of their brief, alleging inaccuracies in PSL's record keeping, is in itself incorrect, incomplete and quite misleading. First, Plaintiffs argue that their Exhibit D demonstrates that Naomi Duncan worked thirty hours but PSL paid her for 103 hours. Ps.' Mem. In Supp. of Mot. for Part. Summ. J. p. 7. Plaintiffs, however, ignore PSL's check number 2309 issued to Naomi Duncan on December 15, 2003 reflecting payment for Naomi Duncan's thirty hours worked between November 16, 2003 and November 30, 2003 (attached as Exhibit "F"). The evidence is clear that Naomi Duncan was paid appropriately despite a notation error on check number 2366. Id. (Including schedule and paychecks for prior and subsequent weeks worked.)
>
> Second, in a further misstatement of the evidence, Plaintiffs allege that Mary McCombs's timesheet for the period of June 16, 2003 through June 20, 2003 indicates that she worked 93.5 hours but that her correlated paycheck indicates payment for only 80 hours. Ps.' Mem. In Supp. of Mot. for Part. Summ. J. p. 7, n. 5. In fact, in support of this allegation, at their Exhibit E Plaintiffs supplied a timesheet for Anita Duncan and a paystub for Mary McCombs. McCombs's actual timesheet for the relative period indicates that she worked 80 hours, the same number of hours reflected on her paystub (attached as Exhibit "G").

Defendants' Brief in Response, at 21-22. Thus, it would appear that the records thus far presented are inadequate and that under relevant case law the court would consider whether there was "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." <u>Lee v. Vance Exec. Protection,</u> <u>supra</u>.

While plaintiffs appear to have satisfied the first prong of the test as to the

collective eight (8) hours for which they supplied paychecks and corresponding schedules, as to any other hours for which they allege they worked but were not compensated, the court cannot at this point find that plaintiffs have produced "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. Indeed, the evidence that has been submitted as to such other straight time is so arguably inaccurate as not to constitute evidence that would otherwise be admissible inasmuch as it would likely confuse and mislead a trier of fact, as it has this court in conducting this review. Indeed, such materials do not provide even a basis for the court to estimate uncompensated overtime inasmuch as defendants have submitted in response examples of pay checks and schedules for weeks where plaintiffs did not work overtime. Defendants' Ex. H.

Inasmuch as a genuine issue of material fact remains as to what hours plaintiffs' worked and what hours they were paid for in regards to straight time, the court finds that at this point there is insufficient evidence to estimate the amount and extent of hours worked in excess of forty per week for each plaintiff. Plaintiffs' Motion for Partial Summary Judgment will be denied and plaintiffs can better present whatever evidence they have at trial.

### B.    Sleep Time for Tours Lasting Less than 24 Hours

Plaintiffs also seek partial summary judgment arguing that they are entitled to compensation for sleep hours as a matter of law for any shifts lasting less than 24 hours. In support of such proposition, plaintiffs point to 29 C.F.R. § 785.21, which provides in part, as follows:

> [a]n employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy. … It makes no difference that [he or] she is furnished facilities for sleeping. Her time is given to her employer. She is required to be on duty and the time is worktime.

29 C.F.R. § 785.21. Plaintiffs argue that the court should give this regulation force and effect of law, while defendants argue that it is not law, but merely a statement of general policy by the Administrator of the Wage and Hour Division. The parties have cited case law on each side of this issue, and with no decisions issuing from the Fourth Circuit on this point, the court has found instructive <u>Shannon v. Pleasant Valley Cm'ty Living Arrangements, Inc.</u>, 82 F.Supp.2d 426 (W.D.Pa. 2000), which addressed the import Section 785.21 in a nearly identical action brought by employees of group homes for mentally challenged individuals. The <u>Shannon</u> court found, as follows:

> The Wage and Hour Division of the Department of Labor has set forth certain interpretive rules applicable to the issue of sleep time compensation. *See* 29 C.F.R. §§ 785.21 , 785.22, 785.23. These rules, which merely state the agency's position on what the underlying statute means in particular contexts, do not have the force of law and it is not precisely settled whether the interpretations embodied therein are entitled to substantial deference under Chevron or some lesser *quantum* of consideration. *Compare Ingram v. County of Bucks*, 144 F.3d 265, 268 (3d Cir.1998) (applying "substantial deference" and citing, *inter alia*, *Elizabeth Blackwell Health Ctr. v. Knoll*, 61 F.3d 170, 182 (3d Cir.1995) (applying *Chevron* deference to agency interpretive rule)) with *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir.1991) (interpretation "constitute[s] the agency's 'body of experience and informed judgment' about the statute and ... should be given 'considerable and in some cases decisive weight' ") *(citing Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), no discussion of *Chevron*). At a minimum, these interpretive rules are a substantial resource of agency expertise "to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. 134, 140, 65 S.Ct. 161 (1944) FN7; *accord Beaston v. Scotland School for Veterans'*

*Children*, 693 F.Supp. 234, 237 (M.D.Pa.1988), *aff'd mem.*, 869 F.2d 587 (3d Cir.1989). Here, however, no party seriously contends that the agency's interpretation does violence to the intent of Congress as expressed in the FLSA and I can discern no such unfaithfulness to the legislative mandate. Hence, I will apply these rules to the case at bar.

Id., at 429 -30 (footnotes omitted). Here, defendants appear to "seriously contend" that Administrator overstepped his bounds "by issuing 'general Considerations' with respect to 'hours worked'." Defendants' Brief in Response, at 13. Defendants argue that the court should, as directed by the Supreme Court, consider the facts and circumstances surrounding each particular case. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

The Shannon court went on to hold, however, that another interpretive provision, Section 785.23, was more applicable to the group home setting:

> Section 785.23, however, provides potentially the closest fit with the group home situation presented here. Under that provision, employees who reside permanently or for extended periods of time on the employer's premises may enter into "any reasonable agreement" over sleep time, even if they have "periods of complete freedom from all duties" and are permitted, as here, to leave the employer's premises. *See Bouchard v. Regional Governing Bd.*, 939 F.2d 1323, 1330 (8th Cir.1991). If § 785.23 applies, it takes precedence over and supersedes § 785.21. *Braziel v. Tobosa Developmental Servs.*, 166 F.3d 1061, 1064 (10th Cir.1999).

Id., at 431. In turn, Section 785.23 puts aside the strictures of Section 785.21 and allows the employer and employee to enter into agreements governing sleep time under certain circumstances. The court in Shannon found Section 785.23 applicable even though it found that "while the employees do not reside permanently at defendant's group homes, there is no factual dispute that they do reside there for extended periods." Id.

Thus, is not certain to this court at this juncture that defendants are in fact liable as a matter of law to plaintiffs for sleep time during tours of less than 24 hours. Precisely, the court cannot say as to each employee whether they resided at the group homes for extended periods, which appears to be a factually intense determination. While defendants have attacked these administrative rulings, it is not beyond argument that defendants could also assert such rulings as a shield to the very liability plaintiffs now seek to impose:[4]

> In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], the Walsh-Healey Act [41 U.S.C.A. § 35 et seq.], or the Bacon-Davis Act [40 U.S.C.A. § 276a et seq.], if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

29 U.S.C. § 259(a).

While plaintiffs appear to have a good argument, it does not appear that the issue can be resolved as a matter of law at this point, and that the court would need to hear evidence concerning all the circumstances that attended plaintiffs residing in

---

[4] Defendants have not asserted any affirmative defenses; however, Rule 15(b) is quite liberal, and it is at least arguable that such a defense may come into play.

the group homes.  The Motion for Partial Summary Judgment as to sleeptime during tours of less than 24 hours will be denied inasmuch as unresolved factual inquiry appears necessary under either Section 785.21 or Section 785.23.

##### C.    Sleep Time for Tours lasting More than 24 Hours

Plaintiff here argues that summary judgment should be granted to them because the agreement between the plaintiffs and defendants as to sleep time for tours lasting 24 hours or more were not in writing and because there was no meeting of the minds. Compensability of sleep time during a shift of 24 hours or more turns on whether the employer and employee had an agreement that the sleeping period was non-compensable, whether the sleeping period was of no more than the prescribed eight hour duration, whether the sleep time was under conditions allowing at least five hours of uninterrupted sleep, and whether the employee was compensated for *bona fide* sleep interruptions[1]. 29 C.F.R. § 785.22.  The court finds that such inquiry is, like its analogue for sleep time for tours under 24 hours, requires a consideration of a totality of the circumstances and resolution of facts.

While the solution posed by plaintiffs is appealing, the court can find no authority for the proposition that an oral agreement is unenforceable.  Indeed, Section 785.22 specifically provides for agreements that are "express or implied."  Further, the court cannot say that there is no genuine issue of material fact as to whether an agreement was in fact reached, as plaintiffs aptly put it, whether there was a meeting of the minds.  Clearly, each plaintiff herein testified that they understood the job required overnight stays and agreed to the stipend of $20 for sleep hours for tours

lasting 24 hours or more. Plaintiffs challenges to the conditions they encountered in the accommodations does not entitle them from summary judgment, but effectively prevents this court from awarding summary judgment to defendants. See 29 C.F.R. § 785.22 (" Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, <u>provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep</u>. (emphasis added)).

Finding that genuine issue of material fact remain, the court will deny plaintiffs' Motion for Summary Judgment.

## XII. Defendants' Motion for Summary Judgment as to Plaintiffs' Eighth Cause of Action Under State Wage and Hour Laws

The Eighth Cause of Action asserts violations of the overtime provisions of North Carolina's *Wage and Hour Act*. Amend. Compl., at ¶¶ 39-41. The Wage and Hour Act, at N.C. Gen.Stat. § 95-25.14, exempts from minimum wage and overtime coverage its coverage "[a]ny person employed in an enterprise engaged in commerce or in the production of goods for commerce as defined in the Fair Labor Standards Act ...." N.C. Gen.Stat. § 95-25.14(a)(1). In turn, the FLSA defines "enterprise engaged in commerce or in the production of goods for commerce", in part, as an enterprise that "is engaged in the operation of ... an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution ...." 29 U.S.C. § 203(s)(1)(B). Defendants argue that, as

a matter of law, their enterprise is governed by the FLSA and that they are, therefore, exempt from the requirements of the state *Wage and Hour Act*.

In response, plaintiffs have conceded as much, Plaintiffs' Response, at 26, but argue that the claim should remain because the *Wage and Hour Act* expressly contemplates that in the event the FLSA precludes an action under the state law, if North Carolina's minimum wage is higher than its federal counterpart, then a successful plaintiff is entitled to damages calculated on the higher minimum wage. N.C.Gen.Stat. § 95-25.14(a)(1)(b). That provisions provides, as follows:

> Notwithstanding the above, any employee other than a learner, apprentice, student, or handicapped worker as defined in the Fair Labor Standards Act who is not otherwise exempt under the other provisions of this section, and for whom the applicable minimum wage under the Fair Labor Standards Act is less than the minimum wage provided in G.S. 95-25.3, is not exempt from the provisions of G.S. 95-25.3 or G.S. 95-25.4 . . . .

N.C.Gen.Stat. § 95-25.14(a)(1)(b). In turn, Section 95-25.4 provides for payment of overtime, and Section 95-25.22 provides for damages as follows:

> (a) Any employer who violates the provisions of G.S. 95-25.3 (Minimum Wage), G.S. 95-25.4 (Overtime), or G.S. 95-25.6 through 95-25.12 (Wage Payment) shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, their unpaid overtime compensation, or their unpaid amounts due under G.S. 95-25.6 through 95-25.12, as the case may be, plus interest at the legal rate set forth in G.S. 24-1, from the date each amount first came due.
>
> (a1) In addition to the amounts awarded pursuant to subsection (a) of this section, the court shall award liquidated damages in an amount equal to the amount found to be due as provided in subsection (a) of this section, provided that if the employer shows to the satisfaction of the court that the act or omission constituting the violation was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Article, the court may, in its discretion, award no liquidated damages or may award any amount of

liquidated damages not exceeding the amount found due as provided in subsection (a) of this section.

N.C.Gen.Stat. § 95-25.22. If the court recalls the testimony of these plaintiffs correctly, they were all paid at an hourly rate that is significantly higher than either the FLSA minimum wage or the state minimum wage. It appearing that the Eighth Cause of Action may continue to have some significance in the calculation of damages, the court will deny defendants' Motion for Summary Judgment as to such claim.


## ORDER

**IT IS, THEREFORE, ORDERED** that

(1)    plaintiffs' Motion for Partial Summary Judgment as to Defendants' Liability on Plaintiffs' Wage and Hour Claims (#104) is **DENIED;** and

(2)    defendants' Motion for Partial Summary Judgment (#105) is **GRANTED** in part and **DENIED** in part as follows:

    (a)    summary judgment is **GRANTED** as to plaintiffs' first through sixth causes of action, and plaintiffs' first through sixth causes of action are **DISMISSED** against all defendants with prejudice;

    (b)    summary judgment is **DENIED** as to the eighth cause of action; and

    (c)    in addition, summary judgment is granted in favor of defendant Tony Schmidt as to plaintiffs' first through sixth causes of action as such defendant is not a proper party.

Signed: July 31, 2007


Dennis L. Howell
United States Magistrate Judge